All right. Last person must have been very tall. May it please the Court, gentlemen. My name is Kurt Glaser, here with Hannah Spencer today, and I'm going to ask that you consider our spotlight issue today of finding 922 G1 unconstitutional in Mr. Dunn's case and to follow the Bruin decision. I'd start with the fact that the government is making a big argument over plain error, and they cite a case of yours, of course, and I really want to know, first off, if this is even an issue for the panel. I mean, we briefed this as a de novo question because it is so unique, and I think it's de novo. At the end of the Vellos case, I think that you distinguished very well how the Vellos question there that the government raised recently is, in fact, in that case, plain error, but how that is where we're asking the Court to upend 922 G1 as — because it implicates a fundamental right. Does the panel — So did you raise it in the district court or not? We didn't raise it in the district court because we went to trial before Bruin was decided. So why isn't it a forfeited claim, then? Well, it was not a claim that we knew — we anticipated that would be anything that — on our radar, frankly. Well, you may not have anticipated it, but you might have forfeited it for that reason. Well, I understand that argument. So, anyway. You know, if we go along those lines, and here's a man who potentially has been convicted of an unconstitutional — on an unconstitutional statute. If we follow, perhaps, Rahimi and Justice Barrett's dissent from Cantor, we're looking at a situation where this law is unconstitutional as applied to felons, which Mr. Dunn certainly is, and that makes it a very important question here. And I think that it — certainly it's an example of how plain error should definitely be applied if we — if we have forfeited it, because this was not something brought up by the Court or by the government for that fact, and we don't have a jury instruction on it. Frankly, if I had done the trial today, we'd have the same problem. I'd ask for a jury instruction that has to say something like, Judge, can I have a jury instruction that says my client has to be proven guilty beyond a reasonable doubt of an offense that fits within the historical framework of the Second Amendment. And that hasn't been decided as a matter of law. So we couldn't even have asked for that because the matter of law that predicates that doesn't exist. So if you apply the four — the four points of plain error, I think we cover each one of those very carefully. As this is error, it is important. It affects a fundamental right, both Second Amendment and my client's liberty, and it really impugns the reputation of this Court if we don't take up that question. So it seems that even using a plain error analysis like you brought forward in your decision would be wise to consider this case and move forward. So thank you. Well, you skipped one element of plain error review there, which is that on plain error review, the error has to be obvious. It can't be subject to reasonable dispute. I don't think that that's a question here, is that we do have Heller and — Well, it would be because it wasn't the law yet. I mean, the ruling of the Court was That's true, yes. And that's why — Even today, though, the question is, is it obvious, even today? You know — It's subject to reasonable dispute if you're applying plain error review. Correct. Which is why we applied the — or cited the cases of Reed-Ross and Rossen to talk about that you don't necessarily waive something that you can't anticipate, especially something that's important. So we do have that kind of bifurcated argument here to go one way or the other. So I have to agree with you that that would be the weakest link of the plain error argument. But, you know, we have the alternative argument that we brought up in the case law. So thank you. As far as moving forward on that argument, I think the roadmap, if the Court was inclined to use it, we can see that in the Rahimi case from the Fifth Circuit. It does a wonderful job of kind of rolling through the various aspects of this. Of course, that's not a 922G1 case. And the, you know, the additional element or consideration for this Court, I think, could be dealt with by considering the — Justice Barrett's dissent from Cantor. And she takes the position that there's no virtue-based history of just stripping felons of their rights blanketly. Now, there certainly is a history of violent felons being barred from their rights. But 922G1, of course, is much wider in scope than that. We know that there's 4.6 million convicted felons in the United States today, and half of those have do not have gun rights, which should, under the Bruin decision. And what's odd about this case is the government did not cite any historical analogs to support 922G1. That seems to be one of the tenets of Bruin, is that it's the government's burden to make that statement, and we have nothing to move forward on today from that perspective. So I'm without the ability to counter what the government might be saying in terms of whatever historical analogs might support 922G1. So, accordingly, I'm kind of arguing in the dark to say — to suggest that if the Court were to apply the Rapini idea and the Cantor dissent — of course, that's one vote on the Supreme Court right now — to say that felons should not be stripped of their rights, then we should apply that to the historical analog consideration of 922G1. The — I imagine the Court has also reviewed the range decision or will review the range decision from the Third Circuit. Of course, it's been withdrawn. It's interesting that that's happened. We can only speculate, of course, as to which direction that's going to go in. But I thought it was very instructive to see how the Court tried to deal with the historical analogs in that case. There's a great LaRue article out of Duke. Andrew Willinger talks about the importance of how Bruin instructs us that we should follow the historical analogs, but the original range case did something that Bruin told us not to do, and that is, is to interject a means-based test. Of course, they were examining questions of law like Catholics couldn't have guns a couple hundred years ago, and how the Court dismissed that. It's interesting that the professor looks at that question and says, well, didn't the Supreme Court just tell us that we have to follow history? We don't have a right to use a means-based test. And even if it brings us to a place that legislatures can make laws that violate religious restrictions, that are we stuck going in that direction? So it will be interesting to see how range comes out. I want to switch gears a little bit and talk about our evidentiary question in this case. This was a close case. This was an emotional case for me because my client held a gun for 53 seconds and now is going to jail for decades. The government did a wonderful job, I think, in impinging him as being somehow a gang member when they did not bring any other gang evidence in this case other than saying, look, this guy was near a shooting, and he was. He got in a car right after the shooting occurred, because everyone else ran, and he was arrested in this case. That's why it's so important for me to ask you to reconsider what Judge Davis did with the admission of evidence in this case, because every little piece matters here. My client agreed with the government's theory of the case. When we went to, you know, present to the jury, I said that out loud, is that we agree with everything the government said about the substantial part of this case. He held the gun for 53 seconds. But what we couldn't put in front of the jury was so important that his cousin was saying that he threw it in his lap and said, put it in the glove box. And that's the one thing I have to vehemently disagree with Judge Davis in interjecting and saying, well, I don't believe that. I think that's an incredible story. But that's the reason why we have juries, is to allow them to gauge the credibility of that witness. And if that seems like the major tenet of Judge Davis's decision, I don't know that that – I think that steps beyond whether or not we met the 804s and the other evidentiary foundations to admit that evidence. It would have become so important for a jury to hear why a guy held the gun for 53 seconds and admitted it. And we could see the transfer on video. But without the jury hearing that extra piece, combining that with this kind of surprise gang evidence that the – that we got hit with during trial, only to figure out afterwards that my client was no longer in control of his Facebook account and he didn't make that post, those errors were so important in depriving him of a fair trial that I'm asking you to do something that you're not used to doing, and that is to give him a new trial on that grounds. Frankly, it would allow us to fix this error as to questions of whether or not the Second Amendment applies. You know, we'll have that same problem, ask for that jury instruction, won't we? So I am winding down in my time. And if you have any questions, I would take them now and reserve. Otherwise, I'm going to reserve the rest of my time. Thank you, gentlemen. Thank you, Mr. Glaser. Mr. Jacobs. May it please the Court, Your Honors, Assistant United States Attorney Harry Jacobs, on behalf of the United States. I'd like to start where Mr. Glaser started, which is the 922 constitutionality issue. I think in this case the recent decision in Vols is instructive that Mr. Dunn's claim here was forfeited and plain error review applies. Dunn never challenged the constitutionality of 922G prior to this appeal in Vols. Issued earlier this week in a similar context, this Court found that even if Bruin changed relevant law, plain error review still applies. And applying plain error review, Dunn's challenge to the constitutionality of 922G fails. And the type of historical analysis that Dunn requests this Court conduct pursuant to Bruin that regulations are consistent with this nation's historical tradition of firearm regulation, as Vols noted, that exceeds what's required by plain error review. So why is the error not plain? Well, as Vols noted, there are cases like Heller, in the language in Heller that talks about nothing in this opinion should be taken to cast doubt on longstanding prohibitions of the possession of firearms by felons. There are pre-Bruin cases from this circuit, like Irish, that have found felon dispossession laws repeatedly to be constitutional. There are district court cases post-Bruin that have found felon dispossession laws to be constitutional. And there's even dicta from the Vols case. And this Court noted that even if this Court conducted a Bruin historical inquiry, it's doubtful that the statutes at issue there, which are different but related, are consistent with the nation's historical tradition of firearm regulation. So in light of all of those things, including dicta from this Court saying that it's doubtful that it would apply, it could not be plain or clear or obvious error. It's far from plain or clear or obvious. We don't have anything in our record, because of the timing, I suppose, reflecting the introduction of evidence about the historical presence of information about an individual in the position of the appellant here. What would you consider, what would your thoughts be about a limited remand for having, or at least supplemental briefing from the parties to provide this Court with the historical background of the limitation? Your Honor, I would respectfully point to the Vols opinion and emphasize that this is a case of plain error review, and that that type of historical inquiry goes beyond plain error review here. In the context of plain error review, it is not plain or obvious, and therefore that type of historical analysis is not required. Looking at cases like Vols, like Heller, like Irish and other district court decisions, it was not plain or obvious, and therefore a remand on that issue of historical analysis is not necessary here. If Your Honors have no further questions, I'll switch gears to some of the evidentiary issues that were at issue in this case. With respect to the prior testimony of the co-defendant in this case at a change of plea hearing, the district court did not abuse its discretion by prohibiting the introduction of that testimony under any of the three hearsay exceptions that it was offered for. I think importantly, there are key distinctions between testimony of a co-defendant at a change of plea hearing and testimony of a co-defendant at trial, and those distinctions are precisely the reason that courts have found that the opportunity to engage in questioning at a change of plea hearing is distinct and different from the type of cross-examining or questioning that would occur at trial, and that's instructive with respect to former testimony. The co-defendant, Mr. Lindsey, his factual basis at his change of plea had nothing to do with Dunn's reaction to getting a gun, to his intent to possess a gun. It focused on Mr. Lindsey, the elements of the crime, related information to that, his Mr. Lindsey's intent, not Mr. Dunn's intent. With respect to statements against interest and the residual exception, the key point here is that there were not additional circumstances that corroborated that testimony. And in fact, the district court found the opposite, that there were, that there were, the district court concluded that Mr. Lindsey made contradictory, evasive, and implausible statements during his plea colloquy, and that was significant to the district court, that, in fact, there weren't the indications of corroborating circumstances. There were the opposite. Mr. Lindsey and Mr. Dunn were friends, were cousins related, and Mr. Lindsey faced far fewer consequences for criminal liability there. The same district judge took Mr. Lindsey's plea, right? The same district judge, that's correct, Your Honor, and it was also just days before the trial started. How many days, do you know? I don't recall offhand, but less than a week. Thank you. For those reasons, Your Honor, neither the residual exception or statements against interest would apply. In addition, with respect to statements against interest, once Mr. Lindsey decided to plead guilty to being a felon in possession, he was exposed to the same amount of criminal liability, regardless of whether he was making these additional statements. He wasn't exposed to additional criminal liability as required under that exception. Now, he could have faced liability, criminal liability for perjury, for lying, for other things, but that's not what the exception requires. It's, as a basis of his statements, he's exposing himself to criminal liability, and his statements didn't expose himself to any additional criminal liability. If Your Honors have no further questions on that point, I'll switch now to the issue of the admitted gang testimony. In this case, the gang testimony, it was not propensity 404B evidence. I think the Payne-Owens case is instructive here, and that's because the evidence, just like in Payne-Owens, the evidence and testimony was generic and fleeting testimony that contributed to the narrative of the charged crime, and it was intrinsic because it helped provide context and paint a total picture of the crime. It's intrinsic for the same reason that the shooting the night before was intrinsic, because it gave context and because it went to his possession, the firearm, the next day. And the gang evidence was also impeachment because the government's questioning on cross-examination was relevant and fairly raised by Dunn's statements on direct examination that he wasn't involved with the shooting the night before. By painting a picture of himself as a merely innocent bystander, he invited those questions. Importantly, gang membership only came out during cross-examination of the defendant. Is the other side right? There were 20 questions? Approximately. Some of those questions were short follow-up questions, but that's correct. Thank you. But the government didn't offer that information during its case in chief, importantly, because it wasn't fairly raised at that point. Mr. Dunn put it at issue when he testified about his involvement or lack of involvement in the shooting the night before. Now switching to the 403 issue here and weighing the probative value against the prejudicial nature, just gone over some of the issues that make this probative. With respect to gang testimony, but this is not a case like Rourke where the gang was put on trial. This was not a relentless attempt to convict a defendant through his association with the gang. Very discreet pieces of evidence and questions on cross-examination for which the government had a good faith basis to ask. There was no expert testimony about gangs generally. There was no expert testimony about the defendant and others' involvement in gangs. There was no introduction about evidence of prior gang shootings or gang violence either with respect to the gang generally or Mr. Dunn specifically. This was as limited as possible. And because it was so limited, the government cabined the risk of putting the gang on trial. Now, there was no limiting instruction given by the court, but Mr. Dunn did not request a limiting instruction. And this court has held in the Lemon case that the lack of a sua sponte issuing of a limiting instruction is not plain error. And that's exactly what occurred here. And frankly, there's reason that Dunn would not request a limiting instruction. That's because of the minor nature of the gang testimony, not wanting to call that out and make it an issue where none existed by highlighting that gang activity. Your Honors, there are two further questions about the application of the ACCA. But if you would like to address them, please do so. Thank you, Your Honors. The question of gang evidence needs to be put in a more precise context because the whole intrinsic evidence which came in, we're not objecting to that, was implicating my client in a gang shooting where he was not identified as a gang member. He, you know, there was no gang evidence put on trial to connect him. I get all that. But the context of a day's worth of intrinsic evidence about a shooting that's a drive-by combined with just 20 questions is a lot more than 20 questions. And me, it's... I thought you said 20 questions, counsel, in your brief. It is just... I thought I was quoting you on 20. Go ahead. You are. Okay. Go ahead. But the point being is that when you combine that with the intrinsic evidence, the implication is that he is a gang member involved in that shooting. So it amplifies not just 20 questions. So it was unfair for the government to bring that up to try to say that there was a crip. There's no crips in St. Paul. Did you object to the questions? I didn't object to the questions, but we had a motion in limine beforehand on the question of whether this could be raised. There's a whole record of that which we cite in the brief. And so we knew this was coming. It was ruled admissible, and I felt that that was the appropriate level of objection instead of objecting on a per-question basis because it was ruled admissible by the judge. So... And it's before trial, this motion in limine, not some break in court or something. It was the day of. It was not before trial. It was the day of his testimony. During trial? During trial, yes. So I was hit with it the day of because my colleagues across the aisle said very kindly, hey, we're going to do this. And so we brought it before the judge, and the judge ruled on that, that it was admissible, that there was gang evidence. Thank you. And I didn't know what it was at the time. You know, we had never been given this Facebook page. So it was surprise. And, you know, I didn't know until afterwards enough to ask my client enough questions to say, well, did you say this? And the answer is, he didn't have control of his account. You know, his whole family has this account. Was that presented to the jury? We didn't know about it until afterwards. The subject never came up because of the surprise. So we brought that up in a post-trial motion. But, you know, at the time, it was one of those things where in the heat of battle, we didn't know about it because we got hit with it at the last second. Wasn't your client testifying at the time? He was. Well, why? It didn't dawn on him because there was direct questions from the government saying, is this your account? And he said, yes, it's my account. My only thought was he would have known if he didn't control the account. You say you didn't find out until later, but he was the one who knew. Well, he's kindly not a man of average intelligence. And it surprised even him. He didn't know what he was asked about. It was confusing to him. And I had to sort through this with him later on. So that was a big problem for him. I'd also bring up, unless there's any other questions on this, that Bruin came out before our briefs here were submitted. The government did have an opportunity to provide historical analogs. Of course, we would welcome advising the court and helping the court sort through things if a limited remand would help. Of course, my position is that this is such an important evidentiary question that we should have a good record, despite the fact that we really don't. I just want to give my colleagues the opportunity to improve the record. But it's something I think that is important if you're going to make the right decision. So I would not object to that. But I would overall encourage you to consider looking at this and the evidentiary questions. It's, you know, it's hard for a lawyer because we have this needy constitutional question. But I think evidentiary-wise, my client deserves a new trial because of the surprise, because how close a call it was. I hope you will take that into consideration. This was not an overwhelming evidence case that we were disputing anything other than the fact that he didn't intend to possess this weapon. It was thrown in his lap. And that is the most important thing, the evidence of his intention, which would be shown by Mr. Lindsay's testimony, or his lack of intention to possess. And that's what he was deprived of. So I thank you. Does he have any further? Thank you, Mr. Glazer. Thank you.